## Hamilton's Estate.

*Wills—Charitable gift—Vested interest—Interest on fund—Collateral tax.*

1. Testator directed his executors to set aside a fund for the erection and equipment of a home for the aged. The fund was to be paid over to either an existing religious society, or to a corporation to be formed or to trustees as should be determined by the authorities of a particular denomination. He designated the name of the home. He further provided as follows: "If said donee fail, for any reason whatsoever to accept this bequest and carry out the provisions of this clause of my will within five years after my decease, then and in such case this bequest shall lapse, become null and void, and revert to my trust estate hereinafter created." The executors in accordance with the terms of the will organized a corporation, and immediate steps were taken to carry out the terms of the gift. *Held*, that the bequest was a vested estate, and any income therefrom pending the completion of the buildings, belonged to the fund and not to the general estate of the testator.

2. The payment of the collateral tax on a charitable bequest will not be shifted to the principal acting executor of the testator's will, merely because the custodian of the funds of such executor, a trust company, had telephoned to the coexecutors that the balance of the fund for distribution amounted to so much, not taking account of the collateral inheritance tax; and this is particularly so where it appears that no one was injured by such message.

Argued April 20, 1911. Appeal, No. 94, April T., 1911, by William C. Hamilton, from decree of O. C. Allegheny Co., June T., 1909, No. 184, sustaining exceptions to adjudication in Estate of Samuel Hamilton, deceased. Before RICE, P. J., HENDERSON, HEAD, BEAVER and PORTER, JJ. Affirmed.

Exceptions to adjudication.

The opinion of the Superior Court states the facts of the case.

*Error assigned* was in sustaining exceptions to adjudication.

*W. J. Seymour*, of *Seymour, Patterson & Siebeneck*, for appellant, cited on the question of interest: Koon's App.,

113 Pa. 621; Laporte v. Bishop, 23 Pa. 152; Dewart's App.,
70 Pa. 403; Eichelberger's Estate, 170 Pa. 242; Engles's
Est., 167 Pa. 463; Hermann's Est., 220 Pa. 52; Hamilton v.
Porter, 63 Pa. 332; Page's App., 71 Pa. 402; Ashton v.
Wilkinson, 53 N. J. Eq. 227 (30 Atl. Repr. 895); Cannon
v. Apperson, 82 Tenn. 553.

*J. R. Sterrett*, of *Sterrett, Patterson & Acheson*, for appel-
lee, cited as to interest: Bitzer v. Hahn, 14 S. & R. 232;
Manderson v. Lukens, 23 Pa. 31; Carstensen's Est., 196
Pa. 325; Safe Dep. & Trust Co. v. Wood, 201 Pa. 420.

OPINION BY BEAVER, J., July 13, 1911:

Samuel Hamilton, of Pittsburg, was a prominent busi-
ness man who died possessed of a very considerable
estate. He designated with great particularity how that
estate was to be used. He was influenced in directing the
distribution by sentiments which were entirely creditable
to him and which included (a) affectionate remembrance
of his wife, (b) care for the aged, and (c) devotion to the
interests of the church with which he was connected.
These sentiments are fully indicated by several items of
his will, in one of which he provided for the payment of a
balance of a subscription to the Emory Methodist Epis-
copal Church, which amounted to $10,000, upon which
he had paid $2,000. In a codicil to his will, however, he
directed an increase of that contribution, which carried
the aggregate to $17,059.34, less any sum which he may
have paid in his lifetime. He also made provision for the
payment of $1,000 to the Woman's Home Missionary
Society of the Pittsburg Conference of the Methodist
Episcopal Church, for the purpose of enlarging or building
an addition to the present Deaconess' Home, 2000 Fifth
avenue, Pittsburg.

In the fifth section of his will, embracing all of the
worthy sentiments above enumerated which influenced
him, he provided: "I will and direct that my executors
shall set apart the sum of twenty-five thousand dollars
($25,000), to be used in the purchase and equipment of a

property to be known as 'Frances Campbell Hamilton Memorial Methodist Episcopal Church Home for the Aged,' and to be used as a home for such aged persons as the board of managers of the home shall direct. In the location and equipment of said institution, I recommend my executors to consult both the Reverend Charles W. Smith, D. D., editor of the Pittsburg Christian Advocate, as well as the Presiding Elder of the Pittsburg District of the Methodist Episcopal Church at the date of my decease, and it is my desire that my executors be guided as far as possible by such advice. Upon the completion thereof, I will and direct that my executors convey said property, by good and sufficient deed, to The Centenary Fund Society; or, if deemed more advantageous or practical by the Pittsburg Annual Conference of the Methodist Episcopal Church, having in view the objects of such charitable institutions, such conveyance shall be made to trustees or a corporation, which shall remain under the control and direction of the Pittsburg Annual Conference of the Methodist Episcopal Church forever, subject to such rules and regulations as the said Conference may prescribe and as may be necessary and proper for the management of such institution. If, however, before my decease, I should have located and equipped an institution similar to that provided for, then such sum of money as I may have paid on account thereof shall be deducted from said twenty-five thousand dollars ($25,000), and the balance shall be expended in the construction and equipment of said property: the property shall then be conveyed as above provided. Should I have located and equipped such similar institution and conveyed the same before my decease to said Society, trustees or corporation, as above described, then this bequest shall be null and void.

"The acceptance of this bequest by the donee herein named (The Centenary Fund Society) and the naming of the home 'Frances Campbell Hamilton Memorial Methodist Episcopal Church Home for the Aged' I make con-

ditions precedent to the validity of this bequest. Should said donee fail, for any reason whatsoever, to accept this bequest and carry out the provisions of this clause of my will within five (5) years after my decease, then and in such case this bequest shall lapse, become null and void, and revert to my trust estate hereinafter created."

Whilst the law is ready to lend its aid in carrying into effect such a worthy charitable object as is herein provided, it can do so only in accordance with the intention of the testator. This intention is to be governed by the terms of the will. That the subject was near the testator's heart is shown very clearly by the testimony. He discussed it prior to his death and dwelt upon it in conversation with the members of his family, and indeed purchased a property which he thought might be available for the establishment of the home. That it should be established very soon after his death is evidenced by several of the terms of the will. His direction is that the sum of $25,000 shall be set apart by the executors for the purchase and equipment of a property to be known as the "Frances Campbell Hamilton Memorial Methodist Episcopal Church Home for the Aged." He also provides that the executors shall consult certain persons named, one of them being "the Presiding Elder of the Pittsburg District of the Methodist Episcopal Church at the date of my decease," thus clearly indicating that the consultation with the presiding elder should be held by them immediately after his decease. The directions to his executors to set apart the sum of $25,000 clearly indicated that this sum was to be separated from his estate and dealt with as a separate trust fund.

The question of carrying out the provisions of this bequest was discussed by the executors at their first meeting, and steps were immediately taken to carry it into practical effect. In doing this, the executors expended the full amount of $25,000 and also the interest upon the fund which had been accumulated after the death of the testator up to the time of the filing of their

account, leaving nothing whatever for the equipment of the home. In order to secure the equipment, the church to which the testator belonged undertook to raise, by voluntary contributions, the amount that was necessary. There can be no doubt that, if the testator had been living, he would have desired to provide for this equipment himself, as clearly intimated in several parts of his will, and would doubtless have done so, as he did for the fund for the erection of the Emory Methodist Episcopal church, of which he was a member, but however that may have appealed to him, if he had been living, no such appeal can move his executors, who are bound to expend, and can only expend, the fund which he provided for the location, erection and equipment of the institution.

The exceptions to the executors' account deal with two items, first, the interest on the fund set apart, which the exceptant claims should go into the residuary estate, and second, the charging of a collateral inheritance tax upon the bequest to the general estate. The question was raised in the court below upon exceptions to the finding of the auditing judge, and upon final adjudication by the court in banc, the interest upon the fund, as applied in the executors' account, was approved, and the charge of the collateral inheritance tax was changed and charged by the court from the estate of the testator to the bequest itself.

We do not understand that the question of the payment of the collateral inheritance tax is raised by the appellant, so far as this legacy is concerned, but the question is at least argued that, inasmuch as the appellee, the Safe Deposit & Trust Company, the principal acting executor of the estate, and the custodian of its funds and the keeper of the accounts, had telephoned to some one interested that the balance of the fund for distribution amounted to so much, not taking account of the collateral inheritance tax, that the said appellee should be charged with this tax, and that it should not be included as a credit so as to diminish the principal of the

legacy.  We confess our inability to see why the appellee should be compelled to pay the collateral inheritance tax upon the legacy.  The entire collateral inheritance tax upon the several legacies and to collateral heirs and institutions was paid in one sum and charged to the estate. When, therefore, inquiry was made of the trust company as to the amount to be expended for the home, some subordinate in the office of the trust company gave the amount, apparently from an inspection of the books, without deducting the collateral inheritance tax upon this particular legacy.  We are unable to see that anyone was injured thereby.  Certainly the coexecutors, who made the inquiry, as we understand it, suffered nothing, and the estate suffered nothing.  Inasmuch as the fund in the hands of the executors, who are trustees thereof, is sufficient, as we understand it, to pay what was invested in the Frances Campbell Hamilton Memorial Methodist Episcopal Church Home for the Aged, we can see no injury to anyone which should compel the surcharging of this inheritance tax to the appellee.  We think, therefore, the court was entirely correct in its disposition of the question of the payment of the tax, namely, that it should be deducted from the legacy.

The remaining question is as to the interest upon the legacy which the court awarded to the fund and not to the balance of the estate, and in this we think there was no error.  The testator directed this fund to be set apart, that is, to be separated from his estate.  Why?  Surely there was some object in setting it apart.  It was for a specific purpose.  It was managed, when set apart, even if not separated physically, as the balance of the estate was managed, and as any active, reliable trustee would manage an estate, for its best interest.  The accumulations, therefore, belonged, as we take it, to the fund.  Under the evident desire of the testator that fund was to be invested as early as possible in a property for the establishment of the home.  Steps were practically immediately taken to that end.  A corporation was organized, a

property was selected, additions were made thereto and the executors, co-operating with the persons with whom they were directed to co-operate by the testator, carried out his benevolent intentions in a way which has elicited no criticism or exception on the part of the heirs. Why, therefore, was not that fund entitled to its earnings in accordance with the evident intent of the testator? The appellant alleges that the reason is found in the condition contained in the will, which is: "Should said donee fail, for any reason whatsoever, to accept this bequest and carry out the provisions of this section of my will within five (5) years after my decease, then and in such case this bequest shall lapse, become null and void, and revert to my trust estate hereinafter created." This, as we regard it, was in no sense a postponement by the testator of the time within which the home should be established and equipped and put in operation, nor does it in any way postpone the immediate carrying out of the benevolent intentions of the testator, for it is also provided in the same clause: "Upon the completion thereof (of the Home) I will and direct that my executors convey said property by good and sufficient deed to The Centenary Fund Society; or, if deemed more advantageous or practical by the Pittsburg Annual Conference of the Methodist Episcopal Church, having in view the objects of such charitable institutions, such conveyance shall be made to trustees or a corporation, which shall remain under the control and direction of the Pittsburg Annual Conference of the Methodist Episcopal Church forever, subject to such rules and regulations as the said Conference may prescribe and as may be necessary and proper for the management of such institution."

It is quite apparent, therefore, that there was no postponement of the founding, or location, or building or equipment of the home until after the five years had elapsed. The intention of the testator was to have, as already appears, the home located and built and equipped as soon as possible. This was done. A corporation was formed prac-

tically as soon as possible and every effort made to carry
out the intentions of the testator, so that it was not neces-
sary for any reason to await the termination of the period
named in the will when there should be a reversion to the
estate by reason of a failure on the part of the Centenary
Fund Society to accept the bequest and name it, in accord-
ance with the wish of the testator, for his wife. This was
all done, as we understand it, long before that period
elapsed. There was, therefore, no lapsing of the legacy
and the testator fixed no time within which the bequest
could be accepted and the home named. This was all
done, as we understand it, long prior to the end of the
period named, so that it was doubtless his intention—and
we think the language of the bequest is indicative of
this—that the bequest should vest immediately, but the
limit within which it should be enjoyed, without a con-
veyance and the name which he designated, was fixed
by the testator, not for the purpose of postponing the
enjoyment of the results of the benefaction but simply
to insure the complete realization of his fond hopes of
making permanent and complete in every respect the
object which he had in view.

In Bitzer's Executor v. Hahn et ux., 14 S. & R. 232,
under the following bequest by a testator: "Item. I give
and bequeath unto each of the children of my daughter
B. two hundred and fifty pounds, to be paid to them out
of the money which may come into the hands of my ex-
ecutor, after the legacies are paid to my said two young-
est sons; but it is my will, and I order, that if any of my
sons or grandchildren, to whom I have given the said
legacies, should die in their minority, and without issue,
then such legacy shall be divided to and amongst my six
children, to whom I have given the residue and remainder
of my estate," it was "Held, that by comparison with
other parts of the will and under the circumstances of the
case, the executor was liable for interest upon the leg-
acies to the testator's grandchildren, from the time he
had sufficient funds in his hands to pay them, after pay-

ment of the other legacies, which had a priority by the will; and not merely from the time a demand was made, and a refunding bond tendered."

In the case we are considering there was nothing to take precedence of the bequest for the home, and, so far as the will itself intimates, nothing which more strongly appealed to the testator himself.

So in Manderson v. Lukens, 23 Pa. 31, it was held: "The vested or contingent character of an estate is not to be tested by the certainty or uncertainty of obtaining the possession, for that would make its character depend, not upon the terms of its creation, but on the form of the result; nor by the defeasibility or indefeasibility of the right of possession, for many estates are vested without possession as well as with it, and are yet defeasible.

"If there be a present right to a future possession, though that right may be defeated by some future event, contingent or certain, there is nevertheless a vested estate. An unpossessed estate is vested if it is certain to take effect in possession by enduring longer than the precedent estate."

See also Carstensen's Estate, 196 Pa. 325, and Safe Deposit & Trust Co. v. Wood, 201 Pa. 420.

We conclude, therefore, that this bequest was a vested estate, to be divested in the future based only upon the refusal by the beneficiary to accept or to call the home by the name fixed by the testator. The property being set apart and the estate vested, it seems to us that the income or increase of the estate so set apart belonged to it and not to the general trust estate of the testator. We think, therefore, the court was correct in awarding the interest upon the fund, less the collateral inheritance tax, to this fund and that the distribution, as made by Judge MILLER in the decree, to which the appellant excepts, should be affirmed.

It is, therefore, ordered that the decree of the orphans' court be affirmed and the appeal dismissed, at the costs of the appellant.